UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| JIMMY CATO,[1]     a/k/a JIMMIE CATO     Petitioner,  v.  RICHARD IVES, WARDEN,     Respondent. | Civil No. 12-193-GFVT  **MEMORANDUM OPINION & ORDER** |

\*\*\*\*   \*\*\*\*   \*\*\*\*   \*\*\*\*

Jimmy Cato, a/k/a Jimmie Cato, is an inmate confined in the United States Penitentiary-McCreary in Pine Knot, Kentucky. Proceeding without an attorney, Cato has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging a prison disciplinary conviction and the resulting sanctions. [R. 1] Cato has paid the $5.00 filing fee.

In March 2011, while confined in the Federal Correctional Institution ("FCI")-Three Rivers in Three Rivers, Texas, Cato was charged with introducing narcotics into the prison, a serious prison disciplinary infraction. The hearing officer found Cato guilty of the charged offense and imposed various sanctions, including the forfeiture of forty days of Cato's good-time credits (GTC). Cato alleges that his due process rights guaranteed under the Fifth Amendment of

---

[1] In his petition, Plaintiff spells his first name "Jimmy," but in other actions he has spelled his name "Jimmie." *See Cato v. Holland*, No. 13-cv-34-KKC (E.D. Ky. 2013). "Jimmy" is the name the Bureau of Prisons has assigned to his inmate registration number. Inmate Locator, Federal Bureau of Prisons, http://www.bop.gov (follow "Inmate Locator" hyperlink; then search for "Jimmy Cato"; search reveals registration number 59372-079). As in *Cato v. Holland*, the Clerk of the Court is directed to identify the petitioner as "Jimmy Cato" and list "Jimmie Cato" as an alias designation.

1

the United States were violated both before and during the disciplinary hearing. Cato seeks the reinstatement of his forfeited GTC.

The Court conducts an initial review of habeas corpus petitions. 28 U.S.C. § 2243; *Alexander v. Northern Bureau of Prisons*, 419 F. App'x 544, 545 (6th Cir. 2011). The Court must deny the petition "if it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts (applicable to § 2241 petitions under Rule 1(b)). The Court evaluates Cato's petition under a more lenient standard because he is not represented by an attorney. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Burton v. Jones*, 321 F.3d 569, 573 (6th Cir. 2003). At this stage, the Court accepts Cato's factual allegations as true, and construes his legal claims in his favor. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

Having reviewed the petition, the Court must deny it. Cato has not established that his constitutional rights were violated during the disciplinary process.

**I**

On March 2, 2011, "R." Webster, a Special Investigative Supervisor at FCI-Three Rivers, issued an Incident Report charging Cato with violating Bureau of Prisons ("BOP") Code No. 111A, Introduction of Narcotics. [R. 4-1, p. 1] Webster alleged that a prison Correctional Systems Officer had notified him that inmate Jamie Cormier, who was being released from the prison to a Community Corrections Management Office ("CCMO") in Beaumont, Texas, had a letter in his possession addressed to "Michelle, 5218 Browncroft, Houston TX 77021." The letter did not have a return address, but three facts supported Webster's belief that Cato wrote the letter to Michelle Pierson: (1) Pierson's address was "5218 Browncroft, Houston, Texas," (2) Pierson was listed in the prison's records as a person with whom Cato had exchanged e-mail

correspondence, and (3) comparisons of the letter with other letters taken from Cato's property confirmed that Cato had in fact written the letter to Pierson. [*Id*.]

Webster alleged that Cato used "coded and conspiratorial language" directing Pierson to introduce narcotics into the institution during the Parenting Day visit at the end of March 2011. [*Id*.] Webster claimed that Cato wrote that he had paid a girl in Austin $250 for an ounce of marijuana that he was trying to get in the prison; that during the next Parenting Day visit, Pierson was to smuggle the marijuana into the prison by hiding it in her shoe and underwear; that once she was inside the prison, she was to remove the drugs from her person, place them in corn nut and popcorn bags, and leave the bags in the visiting room; and that a "homeboy" who cleaned the visiting room would bring the bags to him. [*Id*.] Webster alleged that Cato's letter also said that Pierson could "pass one or two to him [Cato] by mouth." [*Id*.]

On March 24, 2011, Disciplinary Hearing Officer ("DHO") "C." Bickle presided over the hearing at FCI-Three Rivers. Cato appeared at the hearing, waived his right to a staff representative but declined to initial the Form BP-S294, denied the charge, and disclaimed any knowledge of the letter obtained from Cormier. [R. 4-1, pp. 2-3] An inmate at FCI-Three Rivers, identified as "Srader," testified at the hearing, and Bickle summarized Srader's testimony as follows: "'[Srader] had heard that Cato and Cormier were not getting along and when Cormier got out he was going to f*** him over. He also stated that Cormier and other inmates in the unit were not getting along.'" [*Id*., p. 3, ¶ 2]

Section 2 of the DHO Report lists four witnesses who were "called as witnesses at this hearing and appeared." [R. 4-1, p. 3] However, from the information provided in Section 2, it appears that besides Cato, only Inmate Srader actually appeared and testified at the hearing. Two other inmates are listed as witnesses—Inmates Johnson and Burley—in Section 2 but it

appears they testified via recorded statement. [R. 4-1, p. 3, § 2] Section 4 of the DHO's Report supports this conclusion.

That section required the DHO to (a) list persons who had been requested as witnesses but who were not called, and (b) explain why the requested witnesses were not called.[2] DHO Bickle listed FCI-Three Rivers inmates (Whitley, Johnson, and Burley) and former Inmate Jamie Cormier. It is unclear from the DHO Report who requested Whitley, Johnson, and Burley to appear at the hearing, but Cato made a statement during the administrative remedy process which suggests that the DHO called them as witnesses, not him.[3]

Whitley, Johnson, and Burley's statements were presented to the DHO based on interviews an Investigative Lieutenant had conducted. [R. 4-1, p. 3, § 4] Summaries of the statements were included in the DHO Report:

> (1) Inmate Whitley said that Cato did not have a problem with Cormier, who had been Cato's former cellmate; Cato and Cormier were getting along when Cormier left prison on March 2, 2011; and Cormier gave Cato his radio when he left.
>
> (2) Inmate Johnson said that Cato and Cormier were getting along the night before and the day on which Cormier was released; that Johnson had heard nothing to indicate that Cormier was upset with Cato; that inmates often "haze" an inmate who is going to be released by throwing water on him or pushing him, but that Cato did not participate in any of the mild hazing activities involving Cormier.
>
> (3) Inmate Burley said that Cato and Cormier were good friends and got along like brothers; that they hugged each other just before Cormier left the

---

[2] Section 4 of the DHO Report reads: "The following persons requested were not called for the reason(s) given: (space provided for answer)."

[3] In his April 28, 2011 appeal to the Mid-Atlantic Regional Office (MARO), Cato wrote: "furthermore, the DHO officer finding that an inmates [sic] statement lessens another inmates credibility just because the amount of people who testified for inmate Cormier outnumber the witness who testified in my behalf is inproper [sic] and should have no standing in search of truth and justice." [R. 4-1, p. 6]

>prison on March 2, 2011; and that "Inmate Cormier was involved with hazing last night but he laughed at it and appeared to take it well, it was just horseplay."

[*Id.*] The DHO also stated that he conducted a phone interview with Cormier, who at that time was confined in the Liberty County Jail. [*Id.*] Cormier told him that he did not "set up" Cato and that he had no problems with Cato. [*Id.*] Further, Cormier was not aware that the letter was in his personal property when he left the prison. [*Id.*]

In summary, the DHO identified the arguments which Cato advanced in his defense: (1) Cato had no knowledge of the letter found in Cormier's property; (2) Inmate Srader had previously heard that Cormier and Cato did not get along and that Cormier said that he was going to harm Cato in some way upon release; (3) According to Cato, Cormier said he would throw Cato "under the bus;" (4) Cormier did not want anyone to know that he was leaving the prison "'so he would take the callout and trash it so no one would know that he was on pack out;'" (5) Cormier would carry out his plan to set him up by placing the letter to Pierson in his personal property, so that prison officials would discover it as Cormier left the prison; and (6) Cato was skeptical of the handwriting analysis that had been conducted and wanted an expert to examine the letter. [*Id.*, p. 4, § V, "Specific Evidence Relied on to Support Findings"]

Ultimately, however, the DHO found contrary evidence more convincing as set forth in the DHO's Report, issued April 18, 2011. [R. 4-1, pp. 2-5] Cato was not set up, the Report concluded, rather he attempted to introduce narcotics into the prison in violation of BOP Code 111a. [*Id.*, p. 4] The following findings were relied upon in supporting the DHO's conclusion: (1) the investigating officer's allegations in the Incident Report; (2) the letter addressed to "Michelle"; (3) the fact that Michelle Pierson and Cato had exchanged e-mails and that Pierson had a documented family connection to Cato; (4) the fact the author of the letter said that his

5

"cellie"—who was identified as "J.C." from Beaumont—was "going home so he is going to drop the letter in the mailbox;" and Jamie Cormier's initials are "J.C." and Cormier was in fact being released to a CCMO in Beaumont, Texas; (5) Cormier disclaimed any knowledge of the letter addressed to "Michelle"; and (6) Inmates Whitley, Johnson, and Burley gave statements that Cato and Cormier got along very well. The DHO concluded,

> "It is clear that if Cormier was planning to set you up as you claim, he could have merely waited until he was released to write the letter and mail it rather than risk writing the letter and attempting to take it out in his property. The DHO notes Inmate Cormier was identified with the letter in his property as he was being released from the institution."

[*Id.*]

As a result of those findings, several sanctions were imposed. Cato received a disallowance of 40 days of GTC and disciplinary segregation for 60 days. [*Id.*, p. 5, § VI "Sanction or Action Taken"] He lost his e-mail privileges for 180 days and full visiting privileges for 18 months. [*Id.*] Thereafter, 18 months of visiting privileges were restricted such that only immediate family members may visit. [*Id.*] Finally, a disciplinary transfer was recommended. [*Id.*]

Cato appealed his conviction and sanction. He argued that the DHO based his decision on forged evidence and that the evidence produced could not link him to the letter. Also, he should have been allowed to have the letter examined by handwriting and fingerprint experts. The BOP Central Office affirmed both the conviction and sanction.[4] *See* Central Office Response, [*Id.*, p. 12].

---

[4] Cato did not attach a response from the MARO, but he states that on August 20, 2011, the MARO denied his BP-10 appeal. [R. 1-2, p. 3] The Court accepts this allegation as correct because had the MARO not rejected the merits of Cato's first appeal, the Central Office would

II

Cato alleges that the DHO did not have sufficient evidence to convict him of the charged offense, and as a result, finding him guilty was arbitrary and capricious. Cato further argues that the DHO violated his due process rights. First, his request to have independent handwriting and fingerprint experts analyze the letter discovered in Cormier's property was denied. Second, the DHO refused to administer a lie detector test to him. Third, the statements of Inmates Whitley, Johnson, and Burley were considered at the disciplinary hearing.

A

Cato's insufficient evidence argument fails to consider the teaching of *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445 (1985), that a disciplinary conviction must be upheld as consistent with due process as long as there is "some evidence" to support the decision. *Id.* at 454-55. "Some evidence," as its name suggests, is a lenient standard. *Webb v. Anderson*, 224 F.3d 649, 652 (7th Cir. 2000). A district court has no authority under the guise of due process either to review the resolution of factual disputes in a disciplinary decision or to weigh the credibility of the witnesses. A district court merely ensures that the disciplinary decision is not arbitrary and does have evidentiary support. *Hill*, 472 U.S. at 457. Even meager proof is sufficient under the "some evidence" standard. *Webb*, 224 F.3d at 652.

In this case, there was ample evidence to support the DHO's disciplinary decision, as outlined above. That evidence constituted "some" evidence upon which the DHO could reasonably rely in finding Cato guilty. The DHO was free to assign greater weight to evidence that linked Pierson to Cato than to Cato's arguments that Cormier set him up. Likewise, the DHO was free to assign greater credibility to the verbal statements of Cormier and the written

---

not have addressed the merits of his second BP-11 appeal.

statements of Whitley, Johnson, and Burley over the testimony from Inmate Srader.

Although neither the Incident Report nor the statements from Cormier, Whitley, Johnson, and Burley are complete evidence of guilt, and although Cato raised some factual disputes with the evidence produced against him,[5] it is not this Court's role to weigh the credibility of the evidence or substitute its judgment for that of the DHO. *Hill,* 472 U.S. at 454-55. The DHO Report demonstrates that there is "some evidence" to support the DHO's finding of guilt and imposition of sanctions. *See Cosgrove v. Rios*, 2008 WL 4706638, at *4 (E.D. Ky. Oct. 21, 2008) (finding that DHO's review of reports and memoranda constituted "some evidence" and was enough to support the finding of guilt, imposition of institutional sanctions, and revocation of the inmate's GTC).

**B**

Cato's claim that the DHO violated his Fifth Amendment due process rights by refusing to release the letter to him for evaluation and/or analysis by handwriting and fingerprint experts lacks merit. The process due an inmate with regard to a disciplinary proceeding includes (1) written notice of the charges at least twenty-four hours before a hearing, (2) opportunity to call witnesses and present documentary evidence if doing so is not an undue hazard to institutional safety, and (3) a written explanation of the evidence relied on and reasons for disciplinary action. *Wolff v. McDonnell*, 418 U.S. 539, 564-66 (1974). Prisoners who are lawfully committed to a penal institution are not, however, entitled to the full panoply of rights in disciplinary hearings which would be due in criminal prosecutions. *Id*. at 556.

---

[5] In his April 28, 2011, appeal to the MARO, Cato noted that Cormier told the DHO that he had no knowledge of the letter discovered in his property. [R. 4-1, pp. 6-7] Cato then reasonably questioned "how could I possibly put a letter [in Cormier's possession] and expect it to be mailed without inmate Cormier's knowledge." [*Id*., p. 6]

8

A prisoner facing disciplinary charges does not have an unfettered Sixth Amendment right to call witnesses of his choice and confront adverse witnesses. *Id*. at 556 (distinguishing prison disciplinary proceedings from a criminal prosecution); *Baxter v. Palmigiano*, 425 U.S. 308 (1976). "[A] prison disciplinary proceeding is not a criminal prosecution. Prisoners in this context do not possess Sixth Amendment rights to confront and cross-examine witnesses." *Henderson v. U.S. Parole Comm'n*, 13 F.3d 1073, 1078 (7th Cir. 1994); *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). A prisoner also has no protected due process right in obtaining outside scientific or laboratory testing of evidence to be used against him,[6] *see Wolff*, 418 U.S. at 566-67 (stating reasonable penological needs may limit the right to present evidence), or requiring the prison to find, retain, and present an expert witness on his behalf in the disciplinary proceeding. *Garrett v. Smith*, 180 F. App'x 379, 381 (3d Cir. 2006). Due process also does not require prison officials to administer a lie detector test upon an inmate charged with committing a prison infraction. *See Williams v. Welinger*, 451 F. App'x 127, 129 (3d Cir. 2011); *Jemison v. Knight*, 244 F. App'x 39, 42 (7th Cir. 2007) ("Jemison's argument that the Board improperly refused his request for a test fails because he is not entitled to a lie-detector test at a prison disciplinary hearing as a matter of law."); *Freitas v. Auger*, 837 F.2d 806, 812 n.13 (8th Cir. 1988) (holding

---

[6] Other courts have rejected claims similar to Cato's from inmates seeking outside scientific or forensic testing to rebut evidence used against them in a disciplinary hearing. *See*, *e.g*., *Outlaw v. Wilson*, 2007 WL 1295815, at *2 (N.D. Ind. Apr. 30, 2007) (inmate had no right to require creation of favorable evidence in the form of handwriting analysis or lie detector test results); *Manfredi v. United States*, 2012 WL 5880343, at *6 (D. N.J. Nov. 20, 2012) (rejecting prisoner's claim that the DHO violated his due process rights by denying his request to obtain a second, independent laboratory test of evidence used against him at disciplinary hearing); *Allen v. Purkett*, 5 F.3d 1151, 1153 (8th Cir. 1993) (*per curiam*) (holding that prison officials were not required to provide additional urinalysis by impartial laboratory to corroborate reports about prisoner's drug use); *Rivas v. Cross*, 2011 WL 1601289 at *7–8 (N.D. W.Va. Apr.1, 2011); *Batista v. Goord*, 2005 WL 2179420 (N.D.N.Y. Aug. 28, 2005) (inmate has no due process right to have substance re-tested at an outside laboratory).

that prisoners are not entitled to polygraph tests in disciplinary hearings).

For these reasons, neither the denial of expert handwriting and finger-print analyses nor a lie detector test violated Cato's Fifth Amendment right to due process of law. The same result accrues as to Cato's claim about the statements from Inmates Whitley, Johnson, and Burley.

Pursuant to 28 C.F.R. § 541.8(f)(2) ("Evidence and witnesses), "the DHO need not call witnesses adverse to you if their testimony is adequately summarized in the incident report or other investigation materials." *See also* BOP Program Statement 5270.09, *Inmate Discipline Program*, p. 31 ("Witnesses") "The reporting officer and other adverse witnesses need not be called if their knowledge of the incident is adequately summarized in the incident report and other investigative materials."). Here, the DHO Report clearly explains that an Investigative Lieutenant interviewed Inmates Whitley, Johnson, and Burley, and prepared statements memorializing their observations and comments. Those statements constituted "other investigative materials," which complied with Cato's procedural due process rights.

### III

As Cato's disciplinary conviction was supported by "some" evidence, his Fifth Amendment due process rights were not violated. Cato's motion for partial summary judgment and his § 2241 petition will be denied, and this action will be dismissed.

Accordingly, and the Court being sufficiently advised, it is **HEREBY ORDERED** that:

1. Jimmy Cato's motion for partial summary judgment [R. 4] is **DENIED**;

2. Cato's petition for a writ of habeas corpus [R. 1] is **DENIED**;

3. The Court will enter an appropriate judgment;

4. This matter is **STRICKEN** from the active docket.

This 30th of April, 2013.



Signed By:

*Gregory F. Van Tatenhove*

United States District Judge